Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (SBN 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
40729 Village Dr., Suite 8 - 1989
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

Attorneys for Plaintiff, MONICA DAWKINS

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONICA DAWKINS, on behalf of herself and all similarly situated persons,<br><br>Plaintiff,<br><br>v.<br><br>THE ESTEE LAUDER COMPANIES INC., a Delaware corporation,<br><br>Defendants. | Case No:<br><br>**CLASS ACTION COMPLAINT**<br><br>  1)  **CAL. PENAL CODE § 638.51**<br>  2)  **CAL. PENAL CODE  § 631** |

1

Plaintiff MONICA DAWKINS ("Plaintiff") files this class action complaint on behalf of herself and all others similarly situated (the "Class Members") against Defendant THE ESTEE LAUDER COMPANIES INC., a Delaware corporation ("Defendant" or " ESTEE LAUDER"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to herself, and on information and belief as to all others, by and through the investigation of undersigned counsel.

## I.    <u>NATURE OF THE ACTION</u>

1.    This is a class action lawsuit brought on behalf of all California residents who have accessed and used www.origins.com (the "Website"), a website that Defendant owns and operates.

2.    Defendant surreptitiously installs and operates tracking software on the Website without providing users with adequate notice or obtaining their informed consent. The software is intentionally deployed to accomplish Defendant's commercial objectives, including identity resolution, targeted advertising, and the monetization of consumer data.

3.    To achieve these goals, Defendant enables third-party technologies, that function as unlawful pen registers and/or trap and trace devices, to capture detailed information about users' electronic communications such as Internet Protocol ("IP") addresses, session data, and clickstream activity in real time. These tools operate covertly and without judicial authorization, violating the California Invasion of Privacy Act ("CIPA") where, as here, Plaintiff and Class Members did not consent to the interception, nor did Defendant secure a court order permitting such surveillance.

4.    A pixel tracker, also known as a web beacon, is a tracking mechanism embedded in a website that monitors user interactions. It typically appears as a small, transparent 1x1 image or a lightweight JavaScript snippet that activates when a webpage is loaded, or a user performs a tracked action.

///

5.     When triggered, the pixel transmits data from the user's browser to a third-party server. This data typically includes page views, session duration, referrer URLs, IP address, browser and device details, and other interaction metadata.

6.     When users visit the Website, Defendant causes tracking technologies to be embedded in visitors' browsers. These include, but are not limited to, the following:

- Google Trackers (Analytics / Tag Manager / DoubleClick)
- Facebook Tracker
- Tapad Tracker
- FullStory Tracker

7.     The third parties who operate the above-listed trackers use pieces of User Information (defined below) collected via the Website, as described herein, for their own independent purposes tied to broader advertising ecosystems, profiling, and data monetization strategies, which go beyond Defendant's direct needs, for their own financial gain. The above-listed trackers are referred to herein collectively as the "Trackers."

8.     The Trackers are operated by distinct third parties, including Google LLC (Google Trackers), Meta Platforms, Inc. (Facebook Tracker), Tapad, Inc., a registered California data broker (Tapad Tracker), and FullStory, Inc. (FullStory Tracker). Defendant aids, employs, agrees, and conspires with these Third Parties by embedding their tracking code into the Website's source and by causing users' browsers to automatically transmit metadata including addressing, routing, and signaling information to external servers controlled by these entities. Through the embedded code, Defendant enables the Third Parties to identify users and to support its advertising, profiling, behavioral analysis, and data monetization activities.

9.     On information and belief, Defendant's Website is further equipped with additional third-party tracking processes, including those operated by Pinterest, Inc. (Pinterest Tag), Snap Inc. (Snapchat Pixel), TikTok Inc. (TikTok Pixel), Microsoft Corporation (Bing Ads), and Tealium Inc. (Tealium Tag Management System). These

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

integrations initiate outbound network requests and responses between the user's browser and external servers associated with those entities. Each such process captures addressing, routing, and signaling metadata, including IP addresses, page paths, and session identifiers, which are transmitted to multiple remote endpoints during each browsing session. These transmissions occur automatically upon page load, without user interaction or consent, and enable persistent communication between Defendant's Website and third-party advertising and analytics infrastructure in violation of CIPA.

10.    Through the Trackers, the Third Parties collect detailed user information including IP addresses, browser and device type, screen resolution, installed fonts, color depth, timezone, operating system, pages visited, session duration, scroll depth and/or mouse movement, referring URLs, unique identifiers (such as cookies and ad IDs), and geolocation based on IP (collectively, "User Information"). This information is used for behavioral profiling, geolocation tracking, ad targeting, cross-device tracking, and participation in real-time advertising auctions. Defendant then uses the data collected by the Trackers, and in conjunction with the Third Parties operating them, for targeted marketing and advertising that enable Defendant to monetize its Website. That is, Defendant and the Third Parties benefit from the Third Parties' unconsented-to collection of Plaintiff's and Class Members' personal information.

11.    Because the Trackers capture and transmit users' IP addresses, full page URLs, referrer headers, device identifiers, and other non-content metadata, they function as "pen registers" and/or "trap and trace devices" under Cal. Penal Code § 638.50. These tools silently collect routing and addressing information for commercial use without user interaction, as defined in *Greenley v. Kochava, Inc*., 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023).

12.    The invasiveness of Defendant's conduct is heightened by the entities operating the Trackers, which collect Plaintiff's and Class Members' IP addresses, page paths, and other user-specific information. Google (Analytics / Tag Manager / DoubleClick), Meta Platforms, Inc. (Facebook Pixel), Tapad, Inc. (Tapad Identifier

Graph), and FullStory, Inc. (FullStory Session Replay) each integrate the data obtained from Defendant's Website with information gathered from other websites and applications. These entities link IP addresses and session-level identifiers with pre-existing profiles, thereby enriching persistent identity graphs used to recognize and value users across digital environments. The resulting composite records are fed into advertising ecosystems to refine audience segments and determine bid value, converting users' Website interactions into revenue-generating assets within Defendant's data-monetization framework.

13. Plaintiff and the Class Members did not consent to the installation, execution, embedding, or injection of the Trackers on their devices and did not expect their behavioral data to be disclosed or monetized in this way.

14. By installing and activating the Trackers without obtaining user consent or a valid court order, Defendant violated CIPA § 638.51, which prohibits the use of pen registers and trap and trace devices under these circumstances.

15. Generalized references herein to users, visitors and consumers expressly include Plaintiff and the Class Members.

## II.  **PARTIES**

16. Plaintiff MONICA DAWKINS is a California citizen residing in Tulare County and has an intent to remain there. Plaintiff was in California when he visited the Website including on September 3, 2025, which occurred during the class period prior to the filing of the complaint in this matter. At the time of Plaintiff's recent visits, she was viewing the Defendant's Website for personal purposes. The allegations set forth herein are based on the Website as configured when Plaintiff visited it and such occasion(s), Plaintiff interacted with the Website's homepage (among others) which is where Defendant intentionally embedded the Trackers on Plaintiff's device for the purpose of sharing Plaintiff's personal signaling, routing, and addressing information as described herein.

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

17.    Defendant THE ESTEE LAUDER COMPANIES INC. is a Delaware corporation that owns, operates, and/or controls the Website which is an online platform that offers goods and services to consumers.

18.    The Estée Lauder Companies Inc. is a multinational beauty company incorporated in the State of Delaware with principal executive offices in New York, New York. As of 2025, Estée Lauder's portfolio spans more than twenty prestige brands including Origins, Estée Lauder, Clinique, MAC, La Mer, and Bobbi Brown. The company operates across categories such as skincare, makeup, fragrance, and hair care. It distributes its products worldwide through department stores, specialty retailers, duty free outlets, and digital platforms.

19.    The Estée Lauder Companies employs tens of thousands of people globally, with operations in more than one hundred fifty countries and territories. Its business focuses on the creation, marketing, and distribution of prestige beauty products, combining research and development, international brand management, and a multi channel sales strategy. The company's workforce spans manufacturing facilities, research laboratories, corporate offices, and retail staff across its brand portfolio.

20.    The Website, www.origins.com, serves as the primary digital platform for the Origins brand within Estée Lauder's corporate structure. It provides detailed information about Origins products, brand philosophy, promotional campaigns, and purchasing options. Visitors can create accounts, place orders, participate in rewards programs, and connect with customer support. Origins.com functions not only as an e commerce storefront but also as a central brand hub designed to maintain consumer loyalty and extend Origins' presence in the online marketplace.

21.    Origins.com is integrated into Estée Lauder's larger digital marketing and customer engagement systems. The website uses technologies that collect user information, monitor browsing behavior, and connect those activities to advertising networks. These tools tie consumer activity on Origins.com to Estée Lauder's corporate marketing strategies, which emphasize personalization, cross platform engagement, and

1  audience targeting. Such practices show that consumer interactions on the site are
2  incorporated into broader data driven marketing operations.

3      22.    Defendant is subject to personal jurisdiction in California because it has
4  expressly directed its commercial and data-collection activities toward residents of this
5  state. Defendant's website includes a dedicated section that applies solely to California
6  residents and supplements its general privacy policy, expressly acknowledging
7  obligations under California privacy law. Within that section, Defendant states that it
8  may collect and disclose personal information to its brands, subsidiaries and affiliates,
9  service providers, fraud detection providers, and law enforcement authorities or other
10 government officials where required or permitted by law. Defendant also states that it
11 may sell or share personal information to advertising companies and its brands, and that
12 certain advertising practices may be considered a sale or sharing under California law.
13 The same policy explains that Defendant may offer financial incentives such as discounts
14 and special offers when users provide personal information. These California-specific
15 disclosures show that Defendant intentionally collects, shares, and monetizes the data of
16 California residents, anticipates the benefits of those activities within this state, and has
17 purposefully availed itself of the privileges and protections of California law.
18 Accordingly, Defendant should reasonably anticipate being haled into a California court
19 to answer for violations of California's statutory privacy protections arising from those
20 activities.

21              III.    **JURISDICTION AND VENUE**

22      23.    This Court has subject matter jurisdiction over this action pursuant to the
23 Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in
24 controversy exceeds $5,000,000 and there are over 100 members of the proposed class.
25 Further, at least one member of the proposed class is a citizen of a State within the United
26 States and at least one defendant is the citizen or subject of a foreign state.

27      24.    This Court has personal jurisdiction over Defendant because, on
28 information and belief, Defendant has purposefully directed its activities to the Eastern

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

District of California by regularly engaging with individuals in California through its website. Defendant's illegal conduct is directed at and harms California residents, including Plaintiff, and if not for Defendant's contact with the forum, Plaintiff would not have suffered harm.

25.    Venue is proper in the Eastern District of California pursuant to 28 U.S.C. § 1391 because Defendant (1) is authorized to conduct business in this District and has intentionally availed itself of the laws and markets within this District; (2) does substantial business within this District; (3) Plaintiff owns real property there with an intent to reside indefinitely; and (4) a substantial part of the events or omissions giving rise to the claims occurred within this District.

## IV.    <u>GENERAL ALLEGATIONS</u>

### 1.    *The California Invasion of Privacy Act (CIPA)*

26.    Enacted in 1967, the California Invasion of Privacy Act is a legislative measure designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications. The California Legislature recognized the significant threat posed by emerging surveillance technologies, stating that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

27.    CIPA specifically prohibits the installation or use of "pen registers" and "trap and trace devices" without consent or a court order. Cal. Penal Code § 638.51(a).

28.    A "pen register" is defined as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted," excluding the contents of the communication. Cal. Penal Code § 638.50(b).

29.    Conversely, a "trap and trace device" is a device or process that captures "incoming electronic or other impulses that identify the originating number or other

dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication," again excluding the contents. Cal. Penal Code § 638.50(b).

30.    In practical terms, a pen register is a device or process that records outgoing dialing information, while a trap and trace device is a device or process that records incoming dialing information.

31.    Historically, law enforcement has utilized these devices to monitor telephone calls, with pen registers recording outgoing phone numbers dialed from a specific line and trap and trace devices recording the phone numbers of incoming calls to that line.

32.    Although originally focused on landline telephone calls, CIPA's scope has expanded to encompass various forms of communication, including cell phones and online interactions. For instance, if a user sends an email, a pen register could record the sender's email address, the recipient's email address, and the subject line, essentially capturing the user's outgoing information.

33.    Similarly, if the user receives an email, a trap and trace device could record the sender's email address, the recipient's email address, and the subject line, capturing the incoming information.

34.    Despite predating the Internet, CIPA has been interpreted by the California Supreme Court to apply to new technologies where such application does not conflict with the statutory scheme. *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sep. 26, 2013); *see also, e.g.*, *Shah v. Fandom, Inc*, 754 F. Supp. 3d 924, 930 (N.D. Cal. 2024) (finding trackers similar to those at issue here were "pen registers" and noting "California courts do not read California statutes as limiting themselves to the traditional technologies or models in place at the time the statutes were enacted"); *Mirmalek v. Los Angeles Times Communications LLC*, 2024 WL 5102709, at *3-4 (N.D. Cal. Dec. 12, 2024) (same); *Moody v. C2 Educ. Sys. Inc.* 742F. Supp. 3d 1072, 1076 (C.D. Cal. 2024) ("Plaintiff's allegations that the TikTok Software is embedded in the Website and

collects information from visitors plausibly fall within the scope of §§ 638.50 and 638.51."); *Greenley,* supra, *at* 1050 (referencing CIPA's "expansive language" when finding software was a "pen register"); *Javier v. Assurance IQ, LLC,* 2022 WL 1744107, at \*1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications. This interpretation aligns with the principle that CIPA should be construed to provide the greatest privacy protection when faced with multiple possible interpretations. *Matera v. Google Inc.*, 2016 WL 8200619, at \*19 (N.D. Cal. Aug. 12, 2016).

35.    The conduct alleged herein constitutes a violation of a legally protected privacy interest that is both concrete and particularized. Invasions of privacy have long been actionable under common law. *Patel v. Facebook*, 932 F.3d 1264, 1272 (9th Cir. 2019); *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017).

36.    Both the legislative history and statutory language indicate that the California Legislature intended CIPA to protect core privacy rights. Courts have found that violations of CIPA give rise to concrete injuries sufficient to confer standing under Article III. *See Campbell v. Facebook, Inc*., 2020 WL 1023350; *In re Facebook Internet Tracking Litig*., 956 F.3d 589 (9th Cir. 2020).

37.    Individuals may pursue legal action against violators of any CIPA provision, including Section 638.51, and are entitled to seek $5,000 in statutory penalties per violation. Cal. Penal Code § 637.2(a)(1).

**2.    *The Trackers Are "Pen Registers" and/or "Trap and Trace Devices"***

38.    When the Plaintiff and Class Members accessed the Website, their browsers initiated an HTTP or HTTPS request or "GET" request to Defendant's web server, which hosts the content and functionality of the site. In response, the server transmitted an HTTP response containing the necessary resources, including HTML, cascading style sheets (CSS), JavaScript files, and image assets, used by the browser to render and display the webpage. These resources also included client-side scripts that initiate communication with third-party services for analytics, marketing, and tracking purposes.

The server's instructions include how to properly display the Website, *e.g.,* what images to load, what text should appear, or what music should play.

39.    In addition, the server's instructions included client-side scripts that initiate communication with third-party services for analytics, marketing, and tracking purposes. The instructions cause the Trackers to be installed on a user's browser. The Trackers then cause the browser to send identifying information—including the user's IP address and User Information to the Third Parties. These Third Parties, through their Trackers, also set cookies on Website users' browsers, which sends a unique identifier to these Third Parties that allows them to track users on the Website over multiple visits and across the Internet.

40.    A general diagram of this process is pictured at Figure 1, which explains how Defendant's Website transmits instructions back to users' browsers in response to HTTP requests.

**Figure 1:**



41.    The server's response included third-party tracking scripts that were executed by the Plaintiff's and Class Members' web browsers. These scripts, once executed, initiate client-side functions that capture routing and behavioral metadata and transmit this data, typically via HTTPS requests,  to the servers of third-party tracking vendors. These actions occur without visible indicators or user awareness. The transmitted data, the User Information, is used to profile users and facilitate targeted advertising.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

42.     The Trackers operate by initiating HTTP or HTTPS requests using either the GET or POST method from the user's browser to external servers controlled by the Third Parties. These requests are triggered by user interactions with the Website and are used to transmit behavioral data and Device Metadata, including information such as page views, click events, session duration, and identifying browser characteristics.

43.     Plaintiff and Class Members did not provide their prior consent to Defendant to install the Trackers on their browsers or use the Trackers. Nor did Defendant obtain a court order before installing or using the Trackers.

44.     An IP address is a numerical identifier assigned to each device or network connected to the Internet, used to facilitate communication between systems. *See hiQ Labs, Inc. v. LinkedIn Corp.*, (9th Cir. 2019) 938 F.3d 985, 991 n.4. The most common format, known as IPv4, consists of four numbers separated by periods (*e.g.*, 191.145.132.123). IPv4 is the traditional format of IP addresses and, because it has a finite amount of combinations, it is limited to approximately 4.3 billion addresses. Because this proved to be insufficient as the Internet grew, IPv6 was introduced. IPv6 offers a vastly larger address space with 340 undecillion possible addresses. While IPv6 adoption has been increasing, many networks still rely on IPv4.[1]

45.     Much like a telephone number, an IP address guides or routes an intentional communication signal (*i.e.*, a data packet) from one device to another. An IP address is essential for identifying a device on the internet or within a local network, facilitating smooth communication between devices. IP addresses can be used via external geolocation services to infer a user's general location, including state, city, approximate latitude and longitude, and in some cases, ZIP code.

46.     Public IP addresses are globally unique identifiers assigned by Internet Service Providers ("ISPs") that allow devices to communicate directly over the Internet.

---

[1]  *See*, *e.g.*, *What is the Internet Protocol*, CLOUDFLARE, https://www.cloudflare.com/learning/network-layer/internet-protocol/; Stefano Gridelli, *What is an RFC1918 Address?*, NETBEEZ (Jan. 22, 2020), https://netbeez.net/blog/rfc1918/.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

They are globally accessible, meaning they can be reached from anywhere on the Internet, but are not inherently exposed unless data is being transmitted. Public IP addresses are essential for devices requiring direct Internet access.

47.    Public IP addresses can be used to determine the approximate physical location of a device. For example, services like iplocation.io, use databases that map IP addresses to geographic areas, often providing information about the country, city, approximate latitude and longitude coordinates, or even the internet service provider associated with the public IP. This geolocation capability is leveraged by online advertising and user identification services.

48.    In contrast, private IP addresses are used within internal networks and are not routable on the public Internet. The Internet Assigned Numbers Authority ("IANA") reserves specific ranges of numbers to be exclusively used for private IP addresses (*e.g.*, 172.16.0.0 through 172.31.255.255). They are isolated from the global Internet and can be reused across different networks without conflict. For example, a home network in New York and an office network in Tokyo can both use the same private IP address (*e.g.*, 192.168.1.1) for their routers without conflict.

49.    The distinction between a public and private IP address is fundamental to the architecture of modern networks. Public IP addresses facilitate global communication, while private IP addresses conserve the finite amount of combinations to make an IP address through local network communication. And crucially, a private IP address does not divulge a user's geolocation, whereas a public IP address does and is thus extensively used in advertising.

50.    An analogy is useful. A public IP address is like the number for a landline telephone for a household. A private IP address is like each handset that is connected to that landline number (*e.g.*, "Handset #1," "Handset #2"). A lot can be gleaned from knowing the phone number that is making the call, while knowing Handset #1 versus Handset #2 is making a call provides additional information.

51.    The same is true of IP addresses. The public IP address divulges the approximate location of the user that is connecting to the Internet and the router directing those communications (presumably the user's house or workplace), and it is the means through which the user actually communicates with the website and the Internet at large. The private IP address then distinguishes between the devices accessing the same public IP address.[2]

**Figure 2:**



*Each device on a network has a private IP address, and the router has a public IP address to communicate with the rest of the internet.*

52.    Thus, the differences between public and private IP addresses are as follows:[3]

/ / /

/ / /

_____

[2] While the Trackers do not collect private IP addresses, as discussed below, the Trackers also collect Device Metadata, which distinguishes between devices accessing the same public IP address. So, by installing the Trackers on Website users' browsers, Defendant allows third parties to collect information that is analogous to a telephone number (the public IP address) and the specific handset that is making the call (the "Device Metadata").

[3] WHAT'S THE DIFFERENCE BETWEEN A PUBLIC AND PRIVATE IP ADDRESS?, AVIRA (Jan. 31, 2024), https://www.avira.com/en/blog/public-vs-private-ip-address.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 3:**

| Category | Private IP address | Public IP address |
| --- | --- | --- |
| Scope | The private IP address only has a local scope in your own network. | The public IP address's scope is global. |
| Communication | It is used so devices within a network can communicate with each other. | It allows access to the internet and is used for communication outside of your own network. |
| Uniqueness | It's an address from a smaller range that's used by other devices in other local networks. | It's a unique address that's not used by other devices on the internet. |
| Provider | The router assigns a private IP address to a specific device on the local network. | The internet service provider assigns the public IP address. |
| Range | Private IP address ranges:<br><br>10.0.0.0 – 10.255.255.255,<br><br>172.16.0.0 – 172.31.255.255,<br><br>192.168.0.0 – 192.168.255.255 | Any IP address that isn't within a private IP address range. |

53.    A public IP address is therefore "routing, addressing, or signaling information." A public IP address functions as "routing, addressing, or signaling information" by facilitating internet communication. It provides essential information that can help determine the general geographic coordinates of a user accessing a website through geolocation databases. Additionally, a public IP address is involved in routing communications from the user's router to the intended destination, ensuring that emails, websites, streaming content, and other data reach the user correctly.

54.    As "routing, addressing, or signaling information," a public IP address is indispensable for maintaining seamless and efficient communication over the Internet. It ensures that data packets are sent from the user's router to the intended destination, such as a website or email server.

55.    A public IP address is "addressing" information because it determines the general geographic coordinates of the user who is accessing a website.

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

56.    A public IP address is "routing" or "signaling" information because it is sending or directing the user's communication from the router in their home or work to the website they are communicating with, and ensuring that "emails, websites, streaming content, and other data reaches you correctly."[4]

57.    Through a public IP address, a device's state, city, zip code, and approximate latitude and longitude can be determined. Thus, knowing a user's public IP address and therefore geographical location "provide[s] a level of specificity previously unfound in marketing."[5]

58.    A public IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code"[6] and (ii) "to target specific households, businesses[,] and even individuals with ads that are relevant to their interests."[7] Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a] product or service"[8] because "[c]ompanies can use an IP address … to personally identify individuals."[9]

59.    In fact, a public IP address is a common identifier used for "geomarketing," which is "the practice of using location data to identify and serve marketing messages to a highly-targeted audience. Essentially, geomarketing allows [websites] to better serve [their] audience by giving [them] an inside look into where they are, where they have been, and what kinds of products or services will appeal to their needs."[10] For example,

---

[4] Anthony Freda, *Private IP vs Public IP: What's the Difference?*, AVG (June 4, 2021), https://www.avg.com/en/signal/public-vs-private-ip-address.

[5] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[6] *Location-Based Targeting That Puts You in Control*, CHOOZLE, https://choozle.com/geotargeting-strategies/.

[7] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LINKEDIN (Nov. 29, 2023), https://tinyurl.com/c2ne77ua.

[8] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[9] Trey Titone, *The Future Of IP Address As An Advertising Identifier*, AD TECH EXPLAINED (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/.

[10] *See, e.g.*, *The Essential Guide to Geomarketing: Strategies, Tips & More*, DEEP SYNC (Nov. 20, 2023), https://deepsync.com/geomarketing/.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

for a job fair in specific city, companies can send advertisements to only those in the general location of the upcoming event.[11]

60.    "IP targeting is a highly effective digital advertising technique that allows you to deliver ads to specific physical addresses based on their internet protocol (IP) address. IP targeting technology works by matching physical addresses to IP addresses, allowing advertisers to serve ads to specific households or businesses based on their location."[12]

61.    "IP targeting capabilities are highly precise, with an accuracy rate of over 95%. This means that advertisers can deliver highly targeted ads to specific households or businesses, rather than relying on more general demographics or behavioral data."[13]

62.    In addition to "reach[ing] their target audience with greater precision," businesses are incentivized to use a customer's public IP address because it "can be more cost-effective than other forms of advertising."[14] "By targeting specific households or businesses, businesses can avoid wasting money on ads that are unlikely to be seen by their target audience."[15]

63.    In addition, "IP address targeting can help businesses to improve their overall marketing strategy."[16] "By analyzing data on which households or businesses are responding to their ads, businesses can refine their targeting strategy and improve their overall marketing efforts."[17]

64.    The collection of IP addresses here is particularly invasive here: As a report

---

[11] *See, e.g., Personalize Your Website And Digital Marketing Using IP Address*, GEOFLI, https://geofli.com/blog/how-to-use-ip-address-data-to-personalize-your-website-and-digital-marketing-campaigns.
[12] *IP Targeting*, SAVANT DSP, https://www.savantdsp.com/ip-targeting?gad_source=1&gclid=Cj0KCQjw1Yy5BhD-ARIsAI0RbXZJKJSqMI6p1xAxyqai1WhAiXRJTbX8qYhNuEvIfSCJ4jfOV5-5maUaAgtNEALw_wcB.
[13] *Id.*
[14] Herbert Williams, *The Benefits of IP Address Targeting for Local Business*es, LINKEDIN (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-williams-z7bhf.
[15] *Id.*
[16] *Id.*
[17] *Id.*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

from NATO found:

> [a] data broker may receive information about a[]
> [website] user, including his … IP address. The user then
> opens the [website] while his phone is connected to his
> home Wi-Fi network. When this happens, the data broker
> can use the IP address of the home network to identify the
> user's home, and append this to the unique profile it is
> compiling about the user. If the user has a computer
> connected to the same network, this computer will have
> the same IP address. The data broker can then use the IP
> address to connect the computer to the same user, and
> identify that user when their IP address makes requests on
> other publisher pages within their ad network. Now the
> data broker knows that the same individual is using both
> the phone and the computer, which allows it to track
> behaviour across devices and target the user and their
> devices with ads on different networks.[18]

65.    In other words, not only does the collection of IP addresses by the Third Parties cause harm in and of itself, data brokers use IP addresses to identify users, append the IP address to a unique profile containing even more information about the user, attach specific IP addresses to comprehensive user profiles, and track Plaintiff and Class Members across the Internet using their IP addresses, compiling vast reams of other personal information in the process.

66.    For these reasons, under Europe's General Data Protection Regulation, IP addresses are considered "personal data, as they can potentially be used to identify an individual."[19]

67.    When companies build their websites, they install or integrate various third-party scripts into the code of the website in order to collect data from users or perform other functions.[20]

---

[18] HENRIK TWETMAN & GUNDARS BERGMANIS-KORATS, NATO STRATEGIC COMMUNICATIONS CENTRE OF EXCELLENCE, DATA BROKERS AND SECURITY at 11 (2020), https://stratcomcoe.org/cuploads/pfiles/data_brokers_and_security_20-01-2020.pdf.

[19] IS AN IP ADDRESS PERSONAL DATA?, CONVESIO, https://convesio.com/knowledgebase/article/is-an-ip-address-personal-data/; *see also* WHAT IS PERSONAL DATA?, EUROPEAN COMMISSION, https://commission.europa.eu/law/law-topic/data-protection/reform/what-personal-data_en.

[20] *See Third-party Tracking*, PIWIK, https://piwik.pro/glossary/third-party-tracking/ ("Third-party tracking refers to the practice by which a tracker, other than the website directly visited by the user, traces or assists in tracking the user's visit to the site. Third-party trackers are snippets of code that

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

68.    Often times, third-party scripts are installed on websites "for advertising purposes."[21]

69.    Further, "[i]f the same third-party tracker is present on many sites, it can build a more complete profile of the user over time."[22]

70.    Defendant has long incorporated the Trackers' code into the code of its Website, including when Plaintiff and Class Members visited the Website. Thus, when Plaintiff visited the Website, the Website caused the Trackers to be installed on Plaintiff's and other users' browsers.

71.    As described below, when a user visits the Website, the Website's code as programmed by Defendant installs the Trackers onto the user's browser. This allows the Third Parties through their respective Trackers to collect Plaintiff's and Class Members' IP addresses, Device Metadata, and User Information, and pervasively track them across the Internet.

72.    Public IP addresses play a significant role in digital marketing by enabling geographic targeting based on a user's approximate location. Through IP geolocation services, advertisers can often determine a user's country, region, city, and in some cases, ZIP code or service area. In contexts where a static IP address is associated with a fixed residence or business, this data can contribute to household-level or business-level targeting, particularly when combined with other tracking identifiers and third-party enrichment.

73.    Defendant and the Third Parties then use the public IP addresses, Device Metadata, User Information, and other information of Website visitors that are collected and set by the Trackers, including those of Plaintiff and Class Members, to deanonymize Plaintiff and Class Members, serve hyper-targeted advertisements, and unjustly enrich themselves through this improperly collected information. Defendant installs Trackers

---

are present on multiple websites. They collect and send information about a user's browsing history to other companies…").

[21] *Id.*

[22] *Id.*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

on users' browsers to collect User Information, including IP addresses and full URLs, which constitute outgoing routing and addressing metadata under CIPA. These identifiers serve the same function as telephony dialed numbers and therefore meet the statutory definition of a pen register or trap and trace device.

74.     At no time prior to the installation and use of the Trackers on Plaintiff's and Class Members' browsers, or prior to the use of the Trackers, did Defendant procure Plaintiff's and Class Members' consent for such conduct. Nor did Defendant obtain a court order to install or use the Trackers.

**3.     *The Use of Trackers or Beacons and Digital Fingerprinting***

75.     Website users typically expect a degree of anonymity when browsing, particularly when they are not logged into an account. However, upon visiting the Website, Plaintiff's and Class Members' browsers executed third-party tracking scripts embedded by the Defendant. These Trackers operate in the background of the browsing session and collect detailed behavioral and technical information, which is then transmitted to external third-party servers without the users' active awareness.

76.     The Trackers also causes additional data points to be sent from Plaintiff's and Class Members' browser to the Third Parties, which are meant to uniquely identify users across sessions and devices. In addition to the public IP address, key elements include the user-agent string (browser, operating system, and device type) and device capabilities such as supported image formats and compression methods. Persistent identifiers like the PUID, GUID, UID, PSVID, and User-Agent ensure users can be tracked even after clearing standard session data like cookies. Advanced methods like fingerprinting and server-side matching remain unaffected by cookie deletion. Combined, these elements form a detailed, unique fingerprint that allows for cross-site tracking and behavioral profiling.

77.     This process, known as digital fingerprinting, involves compiling various data points such as browser version, screen resolution, installed fonts, device type, and language settings to generate a unique identifier for each user. Fingerprinting can be used

to recognize repeat visits and correlate activity across different sessions or sites. When combined with form inputs, login activity, or third-party enrichment, fingerprinting can contribute to broader profiling of a user's interests, affiliations, or behaviors.

78.    When combined with additional tracking mechanisms such as cookies, login data, and third-party enrichment services, fingerprinting contributes to user profiling. This may include inferring location, browsing habits, consumer preferences, and potentially associating these patterns with known user identities. A sufficiently detailed digital fingerprint especially when correlated with other identifiers such as email addresses, form submissions, or third-party databases, can enable the reidentification of a user.

79.    The ability to associate a persistent digital profile with a specific individual using techniques such as digital fingerprinting has led to the development of a data industry known as identity resolution. Identity resolution involves recognizing users across sessions, devices, and platforms by connecting various identifiers derived from their digital behavior, including IP addresses, browser metadata, cookies, and, in some cases, login credentials. The process may occur deterministically (based on known logins or user-submitted information) or probabilistically (based on behavioral or technical similarity).

80.    In simpler terms, pen register and trap and trace mechanisms, in the digital context, refer to technologies that record metadata such as IP addresses, URLs visited, and device characteristics, information that identifies the routing and addressing of electronic communications. This can be achieved through the deployment of tracking technologies like the Trackers installed, executed, embedded, or injected in the Website, which operate without user interaction or visibility.

81.    The Trackers provide analytics and marketing services to Defendant using the data collected from visitors to the Website when they visited the Website and from when they visited other websites that included the pen register and trap and trace devices.

/ / /

82.    When users visit the Website, installed, executed, embedded or injected Trackers initiate network requests to third-party servers, using invisible image pixels, JavaScript calls, or beacon APIs. These requests include the user's IP address, which is transmitted automatically as part of the HTTP request header. In many cases, the Tracker's server responds by placing a persistent cookie in the user's browser, which serves as a unique identifier that can be used to recognize and track the user across future visits. If a user deletes their browser cookies, this identifier is removed. However, upon revisiting the Website, the process repeats: the browser executes the Tracker's script, a new identifier is set, and the Tracker resumes collecting the user's IP address and associated behavioral data.

**4.    *Plaintiff And Class Members' Data Has Financial Value***

83.    Given the number of Internet users, the "world's most valuable resource is no longer oil, but data."[23]

84.    Consumers' web browsing histories have an economic value of more than $52 per year, while their contact information is worth at least $4.20 per year, and their demographic information is worth at least $3.00 per year.[24]

85.    There is a "a study that values users' browsing histories at $52 per year, as well as research panels that pay participants for access to their browsing histories."[25]

86.    Extracted personal data can be used to design products, platforms, and marketing techniques. A study by the McKinsey global consultancy concluded that businesses that "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[26]

---

[23] Ian Cohen, Are Web-Tracking Tools Putting Your Company at Risk?, Forbes (Oct 19, 2022), https://www.forbes.com/sites/forbestechcouncil/2022/10/19/are-web-tracking-tools-putting-your-company-atrisk/?sh=26481de07444.

[24] *In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d 922, 928 (N.D. Cal. 2015), rev'd, 956 F.3rd 589 (9th Cir. 2020).

[25] *In re Facebook, Inc. Internet Tracking Litigation* (9th Cir. 2020) 956 F.3rd 589, 600.

[26] Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, Capturing value from your customer data, McKinsey (Mar. 15, 2017), https://www.mckinsey.com/businessfunctions/quantumblack/ourinsights/capturing-value-from-your-customer-data.

87.    In 2013, the Organization for Economic Cooperation and Development ("OECD") estimated that data trafficking markets had begun pricing personal data, including those obtained in illicit ways without personal consent. It found that illegal markets in personal data valued each credit cardholder record at between 1 and 30 U.S. dollars in 2009, while bank account records were valued at up to 850 U.S. dollars. Data brokers sell customer profiles of the sort that an online retailer might collect and maintain for about 55 U.S. dollars, and that individual points of personal data ranged in price from $0.50 cents for an address, $2 for a birthday, $8 for a social security number, $3 for a driver's license number, and $35 for a military record (which includes a birth date, an identification number, a career assignment, height, weight, and other information). Experiments asking individuals in the United States and elsewhere how much they value their personal data points result in estimates of up to $6 for purchasing activity, and $150-240 per credit card number or social security number.[27]

88.    The last estimate probably reflects public reporting that identify theft affecting a credit card number or social security number can result in financial losses of up to $10,200 per victim.[28]

89.    Data harvesting is one of the fastest growing industries in the country, with estimates suggesting that internet companies earned $202 per American user in 2018 from mining and selling data. That figure is expected to increase with estimates for 2022 as high as $434 per use, reflecting a more than $200 billion industry.

90.    The Defendant's monetization of personal data constitutes actionable economic harm under federal law, even without evidence of a direct financial loss, as a "misappropriation-like injury" caused by converting user data into a revenue stream

---

[27] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD Digital Economy Papers, No. 220 (Apr. 2, 2013), at 27-28, https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf.

[28] Bradley J. Fikes, Identity Theft Hits Millions, Report Says, San Diego Union Tribune, Sept. 4, 2003, https://www.sandiegouniontribune.com/sdut-identity-theft-hits-millions-report-says-2003sep04-story.html.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

through targeted advertising. *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020).

**5.** ***Defendant Is Motivated To Monetize Consumer Information Regardless of Consent***

91.    By implementing Trackers on the Website, Defendant participates in building detailed behavioral profiles of visitors. These profiles include information such as which users viewed specific products, whether they initiated but abandoned the checkout process, and what pages or buttons they interacted with. This data enables Defendant and its advertising partners to identify repeat visits from the same device or browser. This behavioral data is integrated into third-party advertising platforms, allowing Defendant to deliver retargeted ads to users who previously visited the Website, offer promotional incentives to users who showed purchase intent, and build "lookalike audiences" that target users with similar behaviors or characteristics. These practices significantly improve advertising efficiency and increase the likelihood of converting user engagement into actual sales.

92.    Defendant has a strong financial incentive to deploy the Trackers on its Website without obtaining user consent. By enabling the collection of IP addresses and device-level identifiers through these technologies, Defendant facilitates integration into real-time bidding ecosystems. These systems rely on bidstream data such as IP address, device type, screen resolution, and referral information to assess the value of a potential ad impression. This enables Defendant and its partners to participate in data-driven ad targeting, increase the value of its advertising inventory, and track users across sessions and websites, all of which provide economic benefit despite the privacy implications to users.

93.    IP addresses are a valuable data point in digital advertising and tracking systems. They can be used to approximate a user's geographic location, often down to the city or ZIP code level, enabling location-based targeting. When combined with cookies, browser metadata, and device identifiers, IP addresses contribute to persistent

user tracking across sessions and websites. They also assist advertisers and data brokers in linking anonymous browsing activity to existing user profiles, which enhances ad targeting precision and increases the commercial value of each tracked interaction. IP addresses therefore constitute "routing, addressing, or signaling information" protected under CIPA § 638.50(b).

94.    When users' data is collected without meaningful consent and monetized, they lose control over who can access, use, or distribute their personal information. Data brokers and ad tech firms aggregate and correlate identifiers such as IP addresses, device IDs, and cookies with other personal data to construct detailed consumer profiles. Information initially gathered in one context, such as browsing a retail website, is frequently repurposed for unrelated uses and sold to third parties without the user's awareness. This results in pervasive surveillance, where users are continuously tracked across multiple websites, applications, and devices, often without their knowledge or ability to opt out.

### 6.    *Defendant's Conduct Constitutes An Invasion Of Plaintiff's And Class Members' Privacy*

95.    The collection of Plaintiff's and Class Members' personally identifying, de-anonymized information through Defendant's installation and use of the Trackers constitutes an invasion of privacy.

96.    As alleged herein, the Trackers are designed to conduct targeted advertising and boost Defendant's revenue, all through their surreptitious collection of Plaintiff's and Class Members' personal information.

97.    To put the invasiveness of Defendant's violations of the CIPA into perspective, it is also important to understand three concepts: data brokers, real-time bidding, and cookie syncing.

98.    In short, the import of these concepts is that: (i) the Third Parties are data brokers (or partner with data brokers) that collect user information from Website visitors to uniquely identify and de-anonymize users by combining their IP addresses, Device

Metadata, User Information, and unique user ID values with whatever information those Third Parties have on a user from other sources; (ii) the Third Parties share that information with other entities to create the most complete user profile they can (through cookie syncing), which includes a more complete and non-anonymous portrait of the user; and (iii) those profiles are offered up for sale through the real-time bidding process to the benefit of Defendant and the Third Parties and to the detriment of users' privacy interests.

### a. Data Brokers And Real-Time Bidding: The Information Economy

#### Data Brokers

99.     While "[t]here is no single, agreed-upon definition of data brokers in United States law,"[29] California law defines a "data broker" as "a business that knowingly collects and sells to third parties the personal information of a consumer with whom the business does not have a direct [*i.e.*, consumer-facing] relationship," subject to certain exceptions. Cal. Civ. Code § 1798.99.80(c).

100.    Any entity that qualifies as a "data broker" under California law must specifically register as such Cal. Civ. Code § 1798.99.82(a). The Tapad Tracker employed by Defendant on the Website is operated by registered California data broker Tapad, Inc. ("Tapad").

101.    "Data brokers typically offer pre-packaged databases of information to potential buyers," either through the "outright s[ale of] data on individuals" or by "licens[ing] and otherwise shar[ing] the data with third parties."[30] Such databases are extensive, and can "not only include information publicly available [such as] from Facebook but also the user's exact residential address, date and year of birth, and

---

[29] JUSTIN SHERMAN, DUKE SANFORD CYBER POLICY PROGRAM, DATA BROKERS AND SENSITIVE DATA ON U.S. INDIVIDUALS: THREATS TO AMERICAN CIVIL RIGHTS, NATIONAL SECURITY, AND DEMOCRACY, at 2 (DUKE SANFORD CYBER POLICY PROGRAM, 2021), https://tinyurl.com/hy9fewhs.
[30] SHERMAN, *supra*, at 2.

political affiliation," in addition to "inferences [that] can be made from the combined data."[31]

102.   For instance, the NATO report noted that data brokers collect two sets of information: "observed and inferred (or modelled)." The former "is data that has been collected and is actual," such as websites visited." Inferred data "is gleaned from observed data by modelling or profiling," meaning what users may be *expected* to do. On top of this, "[b]rokers typically collect not only what they immediately need or can use, but hoover up as much information as possible to compile comprehensive data sets that might have some future use."[32]

103.   Likewise, a report by the Duke Sanford Cyber Policy Program "examine[d] 10 major data brokers and the highly sensitive data they hold on U.S. individuals."[33]  The report found that "data brokers are openly and explicitly advertising data for sale on U.S. individuals' sensitive demographic information, on U.S. individuals' political preferences and beliefs, on U.S. individuals' whereabouts and even real-time GPS locations, on current and former U.S. military personnel, and on current U.S. government employees."[34]

104.   This data collection has grave implications for Americans' right to privacy. For instance, "U.S. federal agencies from the Federal Bureau of Investigation [] to U.S. Immigration and Customs Enforcement [] purchase data from data brokers—without warrants, public disclosures, or robust oversight—to carry out everything from criminal investigations to deportations."[35]

105.   As another example:

> Data brokers also hold highly sensitive data on U.S. individuals such as race, ethnicity, gender, sexual

---

[31] Tehila Minkus et al., *The City Privacy Attack: Combining Social Media and Public Records for Detailed Profiles of Adults and Children*, COSN '15: PROCEEDINGS OF THE 2015 ACM ON CONFERENCE ON ONLINE SOCIAL NETWORKS 71, 71 (2015), https://dl.acm.org/doi/pdf/10.1145/2817946.2817957.

[32] TWETMAN & BERGMANIS-KORATS, *supra*, at 11.

[33] SHERMAN, *supra*, at 1.

[34] *Id*.

[35] *Id.* at 9.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

orientation, immigration status, income level, and political preferences and beliefs (like support for the NAACP or National LGBTQ Task Force) that can be used to directly undermine individuals' civil rights.  Even if data brokers do not explicitly advertise these types of data (though in many cases they do), everything from media reporting to testimony by a Federal Trade Commission commissioner has identified the risk that data brokers use their data sets to make "predictions" or "inferences" about this kind of sensitive information (race, gender, sexual orientation, etc.) on individuals.

This data can be used by commercial entities within the U.S. to discriminately target goods and services, akin to how Facebook advertising tools allow advertisers to exclude certain groups, such as those who are identified as people with disabilities or those who are identified as Black or Latino, from seeing advertisements.  Many

industries from health insurance to life insurance to banking to e-commerce purchase data from data brokers to run advertisements and target their services.

…

Given identified discrimination problems in machine learning algorithms, there is great risk of these predictive tools only further driving up costs of goods and services (from insurance to housing) for minority groups.[36]

106.  Similarly, as the report from NATO noted, corporate data brokers cause numerous privacy harms, including but not limited to depriving users of the right to control who does and does not acquire their personal information, unwanted advertisements that can even go as far as manipulating viewpoints, and spam and phishing attacks.[37]

/ / /

/ / /

/ / /

---

[36] *Id.*
[37] TWETMAN & BERGMANIS-KORATS, *supra*, at 8.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1

**Figure 4:**



2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

22    107.   As noted above, data brokers are able to compile such wide swaths of

23  information in part by collecting users' IP addresses, Device Metadata, and User

24  Information, which is used by data brokers to track users across the Internet.[38]

25  / / /

26

27  / / /

28
_____
[38] *Id.* at 11.

108.   Indeed, as McAfee (a data security company) notes, "data brokers can … even place trackers or cookies on your browsers … [that] track your IP address and browsing history, which third parties can exploit."[39]

109.   These data brokers will then:

> take that data and pair it with other data they've collected about you, pool it together with other data they've got on you, and then share all of it with businesses who want to market to you. They can eventually build large datasets about you with things like: "browsed gym shorts, vegan, living in Los Angeles, income between $65k-90k, traveler, and single." Then, they sort you into groups of other people like you, so they can sell those lists of like-people and generate their income.[40]

110.   In short, by collecting IP addresses, Device Metadata, and User Information, data brokers and many of the entities the Third Parties sync with can track users across the Internet, compiling various bits of information about users, building comprehensive user profiles that include an assortment of information, interests, and inferences, and offering up that information for sale to the highest bidder. The "highest bidder" is a literal term, as explained below.

111.   As a result of Defendant's installation of trackers operated by data brokers such as Tapad, together with numerous third parties with which those brokers synchronize, the information of Plaintiff and Class Members is appended to existing profiles maintained by those brokers or used to generate new ones. This linkage is accomplished through the collection of IP addresses, device metadata, and other user information transmitted by the browsers of Defendant's Website visitors.

112.   These profiles are then served up to any companies that want to advertise on Defendant's Website, and Defendant's users become more valuable as a result of having their IP addresses, Device Metadata, and User Information linked to these data broker profiles. Thus, Defendant is unjustly enriched through advertising revenue by

---

[39] Jasdev Dhaliwal, *How Data Brokers Sell Your Identity*, MCAFEE (June 4, 2024), https://www.mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.

[40] Paul Jarvis, *The Problem with Data Brokers: Targeted Ads and Your Privacy*, FATHOM ANALYTICS (May 10, 2022), https://usefathom.com/blog/data-brokers.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

installing the Trackers on Plaintiff's and Class Members' browsers, and thus, enabling the Third Parties to collect Plaintiff's and Class Members' IP addresses, Device Metadata, and User Information without consent.

*Real-Time Bidding*

113.   Once data brokers and many of the entities the Third Parties sync with collect Website users' IP addresses, Device Metadata, and User Information, how do they "sell" or otherwise help Defendant monetize that information? This is where real-time bidding comes in.

114.   "Real Time Bidding (RTB) is an online advertising auction that uses sensitive personal information to facilitate the process to determine which digital ad will be displayed to a user on a given website or application."[41]

115.   "There are three types of platforms involved in an RTB auction: Supply Side Platforms (SSPs), Advertising Exchanges, and Demand Side Platforms (DSPs)." An SSP work[s] with website or app publishers to help them participate in the RTB process." "DSPs primarily work with advertisers to help them "[r]each relevant audiences on the open internet, drive growth, and prove your impact."[42] And an Advertising Exchange "allows advertisers and publishers to use the same technological platform, services, and methods, and 'speak the same language' in order to exchange data, set prices, and ultimately serve an ad."[43]

116.   In other words, SSPs provide user information to advertisers that might be interested in those users, DSPs like Google here help advertisers select which users to advertise and target, and an Advertising Exchange is the platform on which all of this happens.

117.   The RTB process works as follows:

> After a user loads a website or app, an SSP will send user
> data to Advertising Exchanges … The user data, often

---

[41] Sara Geoghegan, *What is Real Time Bidding?*, ELECTRONIC PRIVACY INFORMATION CENTER (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/.

[42] *Id.*

[43] *Introducing To Ad Serving*, MICROSOFT IGNITE (Mar. 3, 2024), https://learn.microsoft.com/en-us/xandr/industry-reference/introduction-to-ad-serving.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

referred to as "bidstream data," contains information like device identifiers, IP address, zip/postal code, GPS location, browsing history, location data, and more. After receiving the bidstream data, an Advertising Exchange will broadcast the data to several DSPs. The DSPs will then examine the broadcasted data to determine whether to make a bid on behalf of their client.

Ultimately, if the DSP wins the bid, its client's advertisement will appear to the user. Since most RTB auctions are held on the server/exchange side, instead of the client/browser side, the user only actually sees the winner of the auction and would not be aware of the DSPs who bid and lost. But even the losing DSPs still benefit because they also receive and collect the user data broadcasted during the RTB auction process. This information can be added to existing dossiers DSPs have on a user.[44]

**Figure 5:**



118. Facilitating this real-time bidding process means SSPs and DSPs must have as much information as possible about Defendant's users to procure the greatest interest from advertisers and the highest bids. These entities receive assistance because Defendant also installs the trackers of data brokers on its users' browsers:

the economic incentives of an auction mean that DSP [or SSP] with more specific knowledge of individuals will win desirable viewers due to being able to target them more specifically and out-bid other entities. As a consequence, the bid request is not the end of the road. The DSP enlists a final actor, the data management

---

[44] Geoghegan, *supra*; *see also* REAL-TIME BIDDING, APPSFLYER, https://www.appsflyer.com/glossary/real-time-bidding/.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

platform (DMP) [or a data broker]. DSPs [or SSPs] send bid requests to DMPs [and data brokers], who enrich them by attempting to identify the user in the request and use a variety of data sources, such as those uploaded by the advertiser, collected from other sources, or bought from data brokers. The DSP with the highest bid not only wins the right to deliver the ad—through the SSP—to the individual. The DSP also wins the right to cookie sync its own cookies with those from the [Advertising Exchange], thus enabling easier linkage of the data to the user's profile in the future.[45]

**Figure 6:**



119.    In other words, SSPs can solicit the highest bids for Website users by identifying and de-anonymizing those users by combining the information they know about that user with the information other data brokers know about that user. If there is a match, then the SSPs will have significantly more information to provide about users, and that will solicit significantly higher bids from prospective advertisers (because the advertisers will have more information about the user to target their bids).

120.    Likewise, a DSP like Google can generate the highest and most targeted bids from advertisers with providing those advertisers with as much information about users as possible, which it does by syncing with data brokers who, in turn, sync with other data brokers and/or are data brokers themselves.

---

[45] Michael Veale & Federik Zuiderveen Borgesius, *Adtech and Real-Time Bidding under European Data Protection Law*, 23 GERMAN L. J. 226, 232-33 (2022) https://tinyurl.com/yjddt5ey.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

121.   All of this naturally enriches Defendant, as its users have now become more valuable thanks to the replete information the Third Parties are able to provide about users.

122.   As the Federal Trade Commission ("FTC") has noted, "[t]he use of real-time bidding presents potential concerns," including but not limited to:

    a.   "incentiviz[ing] invasive data-sharing" by "push[ing] publishers [*i.e.*, Defendant] to share as much end-user data as possible to get higher valuation for their ad inventory—particularly their location data and cookie cache, which can be used to ascertain a person's browsing history and behavior."

    b.   "send[ing] sensitive data across geographic borders."

    c.   sending consumer data "to potentially dozens of bidders simultaneously, despite only one of those parties—the winning bidder actually using that data to serve a targeted ad. Experts have previously cautioned that there are few (if any) technical controls ensuring those other parties do not retain that data for use in unintended ways."[46]

123.   Given Google operates a DSP here, the last point is particularly relevant, as it means Google collects and discloses Website users' information to *all prospective advertisers*, even if advertisers do not ultimately show a user an advertisement. This greatly diminishes the ability of users to control their personal information.

124.   Likewise, the Electronic Privacy Information Center ("EPIC") has warned that "[c]onsumers' privacy is violated when entities disclose their information without authorization or in ways that thwart their expectations."[47]

/ / /

/ / /

---

[46] FEDERAL TRADE COMMISSION, UNPACKING REAL TIME BIDDING THROUGH FTC'S CASE ON MOBILEWALLA (Dec. 3, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/12/unpacking-real-time-bidding-through-ftcs-case-mobilewalla.
[47] Geoghegan, *supra*.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1    125.  For these reasons, some have characterized "real-time bidding" as "[t]he

2    biggest data breach ever recorded" because of the sheer number of entities that receive

3    personal information[48]:

**Figure 7:**



4

5

6

7

8

9

10

11

12

13

14

15

16

17    126.  All of this is in line with protecting the right to determine who does and

18    does not get to know one's information, a harm long recognized at common law and one

19    the CIPA was enacted to protect against. *Ribas v. Clark*, 38 Cal. 3d 355 361 (1985)

20    (noting the CIPA was drafted with a two-party consent requirement to protect "the right

21    to control the nature and extent of the firsthand dissemination of [one's] statements");

22    *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press* 489 U.S. 749, 763-

23    64 (1989) ("[B]oth the common law and the literal understandings of privacy encompass

24    the individual's control of information concerning his or her person.").

25    *Cookie Syncing*

26    127.  It should now be clear both the capabilities of the Third Parties (*i.e.*, data

27    brokers like Tapad who de-anonymize users, or companies who sync with data brokers

28    ---
[48] Dr. Johnny Ryan, "RTB" Adtech & GDPR, https://assortedmaterials.com/rtb-evidence/ (video).

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

for this purpose) and the reasons Defendant installs their Trackers on its Website. The final question is how do these Third Parties share information amongst each other and with others to offer the most complete user profiles up for sale? This occurs through "cookie syncing."

128.    Cookie syncing is a process that "allow[s] web companies to share (synchronize) cookies and match the different IDs they assign for the same user while they browse the web."[49] This allows entities like the Third Parties to circumvent "the restriction that sites can't read each other cookies, in order to better facilitate targeting and real-time bidding."[50]

129.    Cookie syncing ("CSync") works as follows:

> Let us assume a user browsing several domains like website1.com and website2.com, in which there are 3rd-parties like tracker.com and advertiser.com, respectively. Consequently, these two 3rd-parties have the chance to set their own cookies on the user's browser, in order to re-identify the user in the future. Hence, tracker.com knows the user with the ID user123, and advertiser.com knows the same user with the ID userABC.
>
> Now let us assume that the user lands on a website (say website3.com), which includes some JavaScript code from tracker.com but not from advertiser.com. Thus, advertiser.com does not (and cannot) know which users visit website3.com. However, *as soon as the code of tracker.com is called, a GET request is issued by the browser to tracker.com (step 1), and it responds back with a REDIRECT request (step 2), instructing the user's browser to issue another GET request to its collaborator advertiser.com this time, using a specifically crafted URL (step 3).*
>
> …
>
> When advertiser.com receives the above request along with the cookie ID userABC, it finds out that userABC visited website3.com. *To make matters worse, advertiser.com also learns that the user whom tracker.com knows as user123, and the user userABC is*

[49] Panagiotis Papadopoulos et al., *Cookie Synchronization: Everything You Always Wanted to Know But Were Afraid to Ask*, 1 WWW '19: THE WORLD WIDE WEB CONFERENCE 1432, 1432 (2019), https://dl.acm.org/doi/10.1145/3308558.3313542.
[50] Gunes Acar et al., *The Web Never Forgets: Persistent Tracking Mechanisms in the Wild*, 6B CCS'14: ACM SIGSAC CONFERENCE ON COMPUTER AND COMMUNICATIONS SECURITY 674, 674 (2014).

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

*basically one and the same user.* Effectively, CSync enabled advertiser.com to collaborate with tracker.com, in order to: (i) find out which users visit website3.com, and (ii) *synchronize (i.e., join) two different identities (cookies) of the same user on the web.*[51]

**Figure 8:**



130.    Through this process, third party trackers are not only able to resolve user identities (*e.g.*, learning that who Third Party #1 knew as "userABC" and Third Party #2 knew as "user123" are the same person), they can "track a user to a much larger number of websites," even though that "do not have any collaboration with" the third party.[52]

131.    On the flip side, "CSync may re-identify web users even after they delete their cookies."[53] "[W]hen a user erases her browser state and restarts browsing, trackers usually place and sync a new set of userIDs, and eventually reconstruct a new browsing

---

[51] Papadopoulos, *supra*, at 1433.
[52] Papadopoulos, *supra*, at 1434.
[53] *Id.*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1  history."[54] But if a tracker can "respawn" its cookie or link to another persistent identifier

2  (like an IP address), "then through CSync, all of them can link the user's browsing

3  histories from before and after her state erasure.  Consequently: (i) users are not able to

4  abolish their assigned userIDs even after carefully erasing their set cookies, and (ii)

5  trackers are enabled to link user's history across state resets."[55]

6      132.  Thus, "syncing userIDs of a given user increases the user identifiability

7  while browsing, thus reducing their overall anonymity on the Web."[56]

8      133.  Cookie syncing is precisely what is happening here. When each of the

9  Trackers are installed on Website users' browsers, they are calling and/or syncing their

10  cookies with other third parties on the Website. The result of this process is not only that

11  a single user is identified as one person by these multiple third parties, but they share all

12  of the information about that user with one another (because the cookie is linked to a

13  specific user profile). This prevents users from being anonymous when they visit the

14  Website.

15      134.  To summarize the proceeding allegations, data brokers focus on collecting

16  as much information about Website users as possible to create comprehensive user

17  profiles, and the Trackers sync with numerous other data brokers that do the same. The

18  Third Parties collect IP addresses, Device Metadata, User Information, and unique user

19  IDs in the first instance, but those pieces of information are connected to information the

20  Third Parties glean from other sources (*e.g.*, various data brokers) to build

21  comprehensive profiles. Through "cookie syncing," those profiles are shared amongst

22  the Third Parties and with other entities to form the most fulsome picture with the most

23  attributes as possible. And those profiles are offered up for sale to interested advertisers

24  through real-time bidding using the Third Parties' trackers, where users will command

25  more value the more advertisers know about a user.

26  / / /

---

[54] *See id*.

[55] *Id*.

[56] *Id*. at 1441.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

135.   Thus, the Third Parties enrich the value Defendant's users would otherwise command by tying the data they obtain directly from users on the Website (*e.g.*, IP addresses, Device Metadata, User Information, unique user IDs) with comprehensive user profiles.

136.   Accordingly, Defendant is using the Trackers in conjunction with the Third Parties to (i) de-anonymize users, (ii) offer its users up for sale in real-time bidding, and (iii) monetize its Website by installing the Trackers and allowing the Third Parties to collect as much information about Website users as possible (without consent).

137.   Thus, Defendant is unjustly enriched through their installation and use of the Trackers, which causes data to be collected by Third Parties without Plaintiff's and Class Members' consent, and that enable the Third Parties to sell Defendant's user inventory in an ad-buying system. In addition, Plaintiff and Class Members lose the ability to control their information, as their information ends up in the hands of data brokers, advertising inventory sellers, and a virtually unlimited number advertisers themselves without knowledge or consent.

138.   When a user visits the Website, a suite of background tracking technologies is activated immediately upon page load. These include client-side scripts deployed by third-party Trackers, which begin collecting various categories of User Information without any visible indication to the user. Together, these technologies function as a coordinated data collection infrastructure that allows Defendant to analyze user behavior at a highly granular level and to leverage that insight in real time for marketing optimization, user targeting, and business intelligence.

139.   On information and belief, the Trackers operate as part of a vast and interconnected digital advertising ecosystem and these entities leverage shared identifiers, cookie syncing, and cross-device tracking techniques to follow users across websites, platforms, and environments, with tools specifically engineered to build persistent consumer profiles, enabling real-time behavioral targeting and identity resolution at scale.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

140.   Defendant deploys the Trackers to build a behavioral profiling and targeted advertising system. Several of these trackers are dynamically injected into the Website through tag management systems, initiating the collection of user behavior such as pageviews, navigation patterns, and session metadata. Others are directly embedded into the Website's code, firing automatically upon page load. Together, these technologies associate user behavior with device identifiers, cookies, and pseudonymous advertising IDs, facilitating the construction of persistent user profiles for advertising and marketing purposes.

141.   The Trackers participate in programmatic advertising ecosystems by capturing behavioral signals from the Website and linking them to advertising audiences. These trackers enable personalized ad delivery based on users' site interactions and associate browsing activity with broader ad networks through identifier syncing. Each of these platforms sets or reads cookies to maintain persistent tracking across sessions and domains, effectively participating in workflows designed to reidentify users and expand behavioral audience segments for targeted advertising.

142.   Google functions as a demand-side platform by aggregating, analyzing, and monetizing behavioral and demographic data collected through the Website. Through its integrated advertising infrastructure—including Google Ads, DoubleClick, and Display & Video 360—Google connects browsing activity to pseudonymous identifiers and synchronizes those identifiers across multiple advertising exchanges and partner networks. These systems generate unified user profiles that persist across sessions, devices, and domains. By combining behavioral data with device identifiers and geolocation signals, Google's ad-serving framework enables automated bidding, audience segmentation, and cross-channel targeting. In this way, the data collected from the Website is transformed into monetizable audience segments used for programmatic advertising transactions across Google's advertising ecosystem.

///

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

# V.    SPECIFIC ALLEGATIONS

## 1.    *The Google Trackers*

143.   The Google Trackers implemented on the Website consist of Google Analytics and Google Tag Manager, both operated by Google LLC. These technologies enable the capture, organization, and transmission of granular behavioral and technical data from user interactions on the site. Google Tag Manager functions as a tag container that automatically injects additional scripts, pixels, and analytics beacons into the page's source code during each session. Google Analytics processes the data generated by those executions to measure traffic flow, user engagement, and performance metrics used by Google and its partners for marketing optimization and ad targeting.

144.   When executed during a user's browsing session, the Google Trackers collect network metadata including page URLs, referrer information, timestamps, and event-triggered interaction data such as scroll depth, link clicks, and navigation sequences. The trackers also collect device-level technical identifiers, including IP address, browser type, operating system, and language configuration. These data are associated with persistent identifiers stored through cookies or browser storage mechanisms, allowing Google to recognize returning users across multiple sessions, domains, and devices, thereby constructing durable behavioral and demographic profiles.

145.   The evidence shows that the Google Trackers establish live connections from the Website to Google's analytics and advertising infrastructure through JavaScript requests directed to domains such as google-analytics.com, analytics.google.com, and googletagmanager.com. Google Tag Manager executes automatically on page load, triggering dependent scripts and enabling downstream Google services, including ad-serving modules, without any user interaction. Through this coordinated execution, Google continuously collects and routes addressing, routing, and signaling information from user browsers to its advertising ecosystem.

/ / /

146.   Figure 9 below shows a network request transmitted from the browser to the remote host https://analytics.google.com/collect…[full URL omitted]. The visible entry identifies a POST request with a Status Code of 204 and a Remote Address of [2001:4860:4802:34::181]:443. The request URL contains parameters such as v=2, tid=G-TPRV4QE4FE, cid=1457756525.17581542148, ul=en-us, sr=1352x878, and ep.brand=origins, indicating that metadata including user language, screen resolution, and brand context were encoded within the transmission. The response column confirms that the request completed successfully, indicating live connectivity between the client browser and Google's analytics endpoint. The displayed data constitutes direct evidence of addressing, routing, and signaling metadata exchanged between the Website and Google's analytics infrastructure during a real-time browser session.

**Figure 9:**



147.   Figure 10 below shows a live network capture recorded in Fiddler Classic documenting HTTPS requests transmitted in real time from the browser to the host analytics.google.com at the path /g/collect…[full URL omitted]. Each visible entry reflects a POST request returning a Status Code of 204 under the HTTP/1.1 protocol.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

The headers identify Host: analytics.google.com, Connection: keep-alive, sec-ch-ua-platform: "Windows", and Referer: www.origins.com, together indicating the active source and routing context of the connection. The User-Agent field reads "Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/140.0.0.0 Safari/537.36," while query string parameters include tid=G-TPRV4QE4FE, ul=en-qb, sr=1536x784, ep.page_type=home, and ep.brand=origins. These values appear within the structured request metadata as transmitted during the session. The displayed data provides contemporaneous evidence of addressing, routing, and signaling exchanges captured in real time between the client browser and Google's analytics endpoint.

**Figure 10:**



148.   Figure 11 below shows a network log excerpt containing HTTPS requests directed from the browser to external domains including google.com an googletagmanager.com. The visible entries display request paths such as /ccm/collect…[full URL omitted] and /gtag/js…[full URL omitted], with request methods recorded as POST or GET and uniform status codes of 200. Each line specifies

1  the protocol as HTTPS and associates the entries with domains google.com and

2  googletagmanager.com, indicating active exchanges through standard web routing. The

3  table includes structured metadata fields identifying content type, request timing, and

4  response status. The displayed data provides verifiable network records evidencing the

5  addressing, routing, and signaling metadata defining the protocol and endpoint

6  configuration of the communication between the browser and the referenced Google

7  servers.

8  **Figure 11:**



21      149.   Figure 12 below shows a Fiddler Classic capture reflecting multiple live

22  HTTPS requests from the browser to the host googleads.g.doubleclick.net at the path

23  /pagead/viewthroughconversion…[full URL omitted]. The visible entries display Status

24  Codes of 200 and 302 under the HTTPS protocol, confirming active server responses.

25  Each request line includes structured URL parameters such as random=1758872552068,

26  cv=1, fst=1758872552068, and en=gtag.config, indicating individual transmission

27  instances during the same browsing session. The displayed data constitutes direct

28

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1   evidence of addressing, routing, and signaling metadata documenting real-time HTTPS

2   communications between the client and Google's doubleclick.net infrastructure.

3   **Figure 12:**



16   150.   Figure 13 below shows a DNS query sequence documenting connections

17   between the client at 198.19.190.52 and resolver 198.19.0.2 for multiple Google-related

18   domains. The entries include queries and responses for content-autofill.googleapis.com,

19   googleleadservices.com,    6724023.fls.doubleclick.net,    ad.doubleclick.net,    and

20   retail.googleapis.com, with returned IP address values such as 192.178.218.95,

21   172.253.62.95, 142.251.167.156, and 142.251.167.148. Each request and response pair

22   identifies the protocol as DNS and specifies query codes including 0xa055, 0xb828,

23   0x099d, and 0x4953. The displayed data provides verifiable network records evidencing

24   the addressing, routing, and signaling metadata exchanged during domain name

25   resolution between the client and the listed Google host servers.

26   / / /

27

28   / / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1

**Figure 13:**



151.   Figure 14 below shows a table of browser cookie data recorded during a session on the origins.com domain. The visible entries identify cookie names and values including  _ga_TPRV4QE4FE, _gcl_au, _ga, fbp, _pin_unauth, and _uetvid, each associated with domain fields beginning with .ori or ww and uniform path entries of "/". The record also includes metadata for other cookie identifiers such as ssid, _scid, _scid_r, _uetsid, and ab.storage.deviceId., all showing corresponding alphanumeric values under the Value column. The displayed data constitutes direct evidence of stored client-side identifiers reflecting structured metadata maintained and exchanged within the browser's connection state with the origins.com host, evidencing session continuity and addressing parameters between the client and remote endpoint.

///

///

///

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 14:**



152.   Figures 9 through 14 collectively show the sequence of data exchanges forming Defendant's monetization pipeline. Figure 9 captures outbound HTTPS requests initiating contact with Google's analytics infrastructure. Figure 10 shows the transmission of session and device metadata to Google servers. Figure 11 demonstrates simultaneous loading of multiple Google script files from googletagmanager.com and google.com, confirming that the Website triggers concurrent analytics and advertising requests as part of a single integrated process. Figure 12 records additional calls to google.com/ccm/collect and gtag.js endpoints associated with Google Ads and DoubleClick. Figure 13 displays DNS queries resolving googleadservices.com and doubleclick.net, documenting routing through Google's ad-serving network. Figure 14 lists cookies and identifiers (_ga_TPRV4QE4FE, _gcl_au, fbp, _uetvid) stored locally on the user's browser. Together, these figures depict a coordinated flow in which Defendant's Website transmits user metadata to Google, executes concurrent analytics and ad functions, and stores persistent identifiers supporting behavioral profiling and data monetization.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1    153.    Defendant surreptitiously embedded and executed Google Trackers on
2    users' browsers through Google Tag Manager, which is included within the Website's
3    source code. Upon visiting the Website, a user's browser automatically runs the Tag
4    Manager container, which loads Google Analytics and initiates outbound connections to
5    Google's remote servers. These transmissions include page URL, referrer headers,
6    browser characteristics, and session identifiers, forming part of Google's external
7    tracking and advertising infrastructure.

8    154.    The Google Trackers constitute a "process" within the meaning of the
9    California Invasion of Privacy Act because they are software mechanisms that identify
10   users, collect information, and correlate that data across interactions.

11   155.    The Google Trackers also qualify as a "device" because software operates
12   through computing hardware to perform its functions. See, e.g., James v. Walt Disney
13   Co., 2023 WL 7392285, at *13 (N.D. Cal. Nov. 8, 2023).

14   156.    The Google Trackers operate as a pen register and/or trap and trace device
15   under the California Invasion of Privacy Act by capturing addressing and signaling data
16   such as visited URLs, click paths, timestamps, and referrer information, while also
17   processing inbound metadata such as analytics responses and cookie-based identifiers.
18   These exchanges occur automatically as part of the page load, allowing Google to log
19   user activity and link it to ongoing behavioral profiles.

20   157.    Defendant did not obtain a court order authorizing use of a pen register or
21   trap and trace device and did not secure Plaintiff's or Class Members' express or implied
22   consent for installation of the Google Trackers or for the sharing of browser data with
23   Google.

24   158.    As a result, Defendant's implementation of Google Trackers constitutes a
25   violation of the California Invasion of Privacy Act's prohibition against the unauthorized
26   use of a pen register or trap and trace device without user consent or judicial
27   authorization.

28   / / /

1    **2.**    ***The Facebook Tracker***

2        159.   The Facebook Tracker is a behavioral tracking script implemented through

3    Meta's Pixel technology, delivered from domains such as connect.facebook.net and

4    facebook.com/tr/. On the Website, the Facebook Tracker is deployed via Google Tag

5    Manager and executes during the initial page load. Once active, it establishes

6    background communication with Meta's servers, enabling continuous tracking of user

7    activity throughout the session without requiring user action.

8        160.   When a user visits the Website, the Facebook Tracker runs automatically

9    and captures interaction data including page views, navigation activity, and click events.

10   These event signals are transmitted to Meta's servers where they are processed and

11   stored, linking the user's activity on the Website to Meta's advertising and analytics

12   infrastructure regardless of whether the user directly interacts with any Meta service.

13       161.   The Facebook Tracker facilitates identity resolution by correlating

14   behavioral data from the Website with Meta user profiles. For users logged into

15   Facebook, Instagram, or Messenger on the same device, the Tracker can associate on-

16   site behavior with their Meta account. For users not logged in, Meta can still assign

17   persistent identifiers through cookies or other stored parameters, generating

18   individualized behavioral profiles tied to browsing activity on the Website.

19       162.   The Facebook Tracker supports Defendant's targeted advertising objectives

20   by enabling creation of Custom Audiences composed of Website visitors who performed

21   specific actions such as viewing products or initiating checkout. Defendant can use

22   Meta's advertising platform to retarget these individuals or to build Lookalike Audiences

23   that replicate their behavioral characteristics, thereby extending reach to similar users

24   across Meta's network.

25       163.   The Facebook Tracker contributes to Defendant's data monetization

26   practices by translating on-site behavioral activity into measurable advertising value.

27   Through Meta's analytics and attribution tools, Defendant receives feedback on user

28   engagement and campaign performance, allowing it to refine ad strategies and optimize

marketing expenditures. In this way, the Facebook Tracker operates as a central mechanism linking Website user activity to Meta's commercial advertising ecosystem

164.  Figure 15 below shows a set of outbound HTTPS requests from the user's browser to the domain connect.facebook.net. The captured entries include visible requests to https://connect.facebook.net/signals/…[full URL omitted] and https://connect.facebook.net/en_US/…[full URL omitted], each using the GET method with a 200 status response. The table identifies the retrieved JavaScript resource "fbevents.js," which appears twice with corresponding response codes and timing metadata, along with additional entries referencing "signals/config" under the same host domain. These entries collectively represent the structured network metadata documenting the addressing and routing of browser-initiated communications with connect.facebook.net. The displayed data provides verifiable network records evidencing the protocol, host domain, and signaling details of live exchanges between the client browser and the external Meta endpoint.

**Figure 15:**



/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

165.    Figure 16 below shows a recorded HTTPS request to the domain facebook.com/tr… [full URL omitted]. The request header identifies the Request Method as GET and the Status Code as 200 OK, confirming a successful response from the remote host. The visible query string contains structured parameter–value pairs. These paired identifiers and associated fields appear as structured metadata defining the composition of the browser's outbound request to Facebook's endpoint. The displayed data constitutes direct evidence of addressing, routing, and signaling exchanges between the client and the remote Facebook server during a live transmission event.

**Figure 16:**



166.    Figure 17 below shows a Fiddler Classic capture of an HTTPS request sent to the host facebook.com/tr … [full URL omitted]. The capture identifies the Request Method as GET and the Protocol as HTTPS, with a 200 OK response from the remote server. The displayed headers include "Host: www.facebook.com," "Connection: keep-alive," "Referer: https://www.origins.com/," "User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/140.0.0.0 Safari/537.36," and additional visible signaling fields such as "sec-ch-ua," "sec-ch-ua-

51

1  platform," "Accept-Encoding," and "Accept-Language." The Fiddler Classic interface

2  also displays response headers including "HTTP/1.1 200 OK," "Content-Type:

3  text/plain," and "Server: proxygen-bolt." The displayed data documents the addressing,

4  routing, and signaling metadata as recorded in real time through the Fiddler Classic

5  network capture, providing verifiable evidence of the live connection established

6  between the browser and Facebook's remote server.

7  **Figure 17:**



20  167. Figure 18 below shows DNS query and response records documenting

21  communication between source IP address 198.19.190.52 and destination 198.19.0.2.

22  The first entry lists a "Standard query 0x3ebd A connect.facebook.net," followed by a

23  "Standard query response 0x3ebd A connect.facebook.net CNAME

24  scontent.xx.fbcdn.net A 31.13.66.19." The subsequent entries display a "Standard query

25  0x863f A w.facebook.com" and its corresponding "Standard query response 0x863f A

26  w.facebook.com CNAME star-mini.c10r.facebook.com A 31.13.66.35." The displayed

27  data provides verifiable network records evidencing the addressing and routing sequence

used to resolve Facebook domains into their respective IP addresses, establishing the endpoint identification and connection path for the observed exchange.

**Figure 18:**



168.  Figure 19 below shows browser-stored cookie entries listing individual name–value pairs recorded during a session. The visible entries include "_pr.12a5 = HU5nqfXlkl," "_ssid = 5647aed2cab52570cf1," "_abck = 62AB491821C85F4094.," "_fbp = fb.1.1758881347220.24..," "_ga = GA1.1.1919347183.175.," "_ga_TPRV4QE4FE = GS2.1.s1758881347$o1.," and "_gcl_au = 1.1.435699299.1758881." Additional visible entries include "_scid," "_uetvid," "ab.storage.devi.," "ak_bmsc," and "AKA_A2," each containing an assigned alphanumeric value along with associated fields for domain, path, expiration, and size. The displayed data provides verifiable evidence of stored identifiers and session attributes that define persistent state information within the browser's addressing and signaling environment.

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 19:**



169.   Figures 15 through 19 collectively document a continuous sequence of network and browser events establishing the Facebook connection pathway and confirming its operation across multiple protocol layers. Figure 15 shows the initial DNS queries resolving the domains connect.facebook.net and facebook.com to their respective IP addresses, illustrating the addressing and routing stage of communication setup. Figure 16 shows the retrieval of the fbevents.js script from connect.facebook.net, confirming that the browser fetched and executed external JavaScript from Meta's infrastructure. Figure 17, captured in Fiddler Classic, displays the full GET request directed to facebook.com/tr/…[full URL omitted], including query string parameters such as "id=1569264926526506" and "ev=PageView," evidencing the outbound signaling event sent to Meta's endpoint. Figure 18 then reflects the detailed HTTP header exchange and response metadata, including parameters like "Host: facebook.com," "Referer: origins.com," and "Connection: keep-alive," capturing the signaling layer of the transmission. Finally, Figure 19 shows the cookies written to the browser, including identifiers such as "_fbp," "_ga," "_ga_TPRV4QE4FE," and "_gcl_au," which preserve

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

persistent identifiers associated with cross-session communication. Together, these figures depict the full chain of addressing, routing, signaling, and session-state data confirming the establishment of an active client-to-server exchange between the user's browser and Meta's advertising infrastructure.

170.    Defendant surreptitiously installed, executed, and injected the Facebook Tracker onto users' browsers by dynamically injecting Meta's JavaScript pixel through Google Tag Manager. When a user visits the Website, the browser automatically executes this script, triggering outbound requests to Meta's servers and transmitting metadata, including the user's page URL, referrer, browser configuration, and other session-specific details. These tracking operations occur without any user interaction, allowing Meta to collect data from users' sessions silently and without their consent.

171.    The Facebook Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

172.    The Facebook Tracker is at least a "device" because in order for software to work, it must be run on some kind of computing device. See, e.g., *James v. Walt Disney Co.* 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

173.    The Facebook Tracker captures and transmits routing, addressing, and signaling information  such as the user's page URL, referrer, and browser metadata  to Meta's servers as soon as the page loads, often without the user's knowledge or consent. This type of metadata reveals the origin and destination of the user's electronic communications. The connection is not initiated by the user, but rather by code embedded in the website, allowing Meta to intercept and associate those signals with a known or inferred identity. The transmission occurs while the user's communication is still in transit and is diverted to Meta without authorization.

174.    Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' express or implied consent to install the Facebook Tracker on Plaintiff's and Class Members' browser or to collect or share data with Facebook.

1    175.    Consequently, the Facebook Tracker violates CIPA regarding unauthorized

2    use of a pen register and/or trap and trace device without prior consent or court order.

3    **3.    *The Tapad Tracker***

4    176.    The Tapad Tracker, delivered via the domain tapad.com, is a third-party

5    behavioral tracking pixel operated by Tapad, Inc., a registered California data broker.

6    On the Website, the Tapad Tracker is embedded within the page's source code and

7    executes automatically upon page load. Once triggered, it initiates outbound connections

8    to Tapad's servers and transmits metadata including IP address, browser type, device

9    characteristics, timestamp, and persistent identifiers. These transmissions occur

10   passively without user action, confirming that network-level data about each visit is

11   communicated directly to Tapad's infrastructure for aggregation and correlation

12   purposes.

13   177.    The Tapad Tracker functions as a cross-device identity resolution

14   mechanism, enabling the association of disparate user identifiers across browsers,

15   devices, and sessions. Through the use of unique identifiers and probabilistic matching,

16   Tapad links behavioral data observed on the Website to profiles maintained across its

17   broader data broker network. This process allows Tapad to maintain continuity of user

18   identity even when cookies are reset or users switch devices, thereby expanding the

19   scope of behavioral and demographic profiling.

20   178.    The Tapad Tracker supports targeted advertising by transmitting Website

21   interaction data that enables advertisers to recognize returning users and deliver tailored

22   ads across different platforms and partner exchanges. By facilitating re-identification of

23   Website visitors and connecting their behavior to external datasets, Tapad enhances the

24   precision of ad segmentation and targeting within the programmatic advertising

25   ecosystem.

26   179.    As part of the Defendant's data monetization scheme, Tapad plays a critical

27   role by converting Website activity into commercially valuable audience data. As a

28   registered data broker, Tapad aggregates, enriches, and sells audience profiles derived

from these network exchanges, providing advertisers and demand-side platforms with granular behavioral segments. In this way, the Tapad Tracker operationalizes the flow of user metadata from the Website into a monetized data ecosystem where consumer identities and browsing behavior are repackaged for targeted advertising and commercial exploitation.

180. Figure 20 below shows an outbound GET request directed to pixel.tapad.com/…[full URL omitted] with the visible request string "https://pixel.tapad.com/idsync/ex/push/check?partner_id=2884&part…," indicating communication with the remote domain tapad.com. The request includes parameters such as "partner_id=2884" and a nested partner URL referencing "https://tr.snapchat.com/cm/p…[full URL omitted]." The visible metadata further records a status code "302 Found," a remote address "34.111.113.62:443," and header fields including "Accept-Ch" and "Sec-CH-UA." The displayed data provides verifiable network records evidencing the addressing, routing, and signaling exchange through which the browser transmitted a live HTTPS request to the tapad.com endpoint and received an HTTP 302 redirect response from the external host.

**Figure 20:**



1    181.   Figure 21 below shows a real-time network capture recorded through

2    Fiddler, displaying active HTTPS requests made by the browser to multiple external

3    domains during the live session. The visible entries include ui.powerreviews.com/…[full

4    URL omitted], trk.clinch.co/…[full URL omitted], tr6.snapchat.com/…[full URL

5    omitted], and several tr.snapchat.com/…[full URL omitted] requests returning response

6    codes 200 and 302. The metadata section further identifies header fields "Sec-Fetch-Site:

7    same-origin," "Sec-Fetch-Mode: navigate," and "Sec-Fetch-Dest: iframe." The

8    displayed data provides verifiable real-time evidence of addressing, routing, and

9    signaling exchanges occurring during the user's live browsing session, confirming that

10    encrypted HTTPS connections were established and maintained with multiple third-

11    party domains as the session unfolded.

12    **<u>Figure 21:</u>**



25    182.   Figure 22 below shows DNS traffic recorded at timestamps beginning with

26    62.69, in which the client at 198.19.190.52 issued a standard query 0x837d for the A

27    record of pixel.tapad.com, followed by a standard query response from 198.19.0.2

28    resolving pixel.tapad.com to IP address 34.111.113.62. The displayed data constitutes

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

direct evidence of addressing and routing metadata confirming that the client browser resolved the hostname pixel.tapad.com to a specific network endpoint, thereby establishing the connection path used for subsequent communication with that external server.

**Figure 22:**



183. Figure 23 below shows a visible list of cookie name–value pairs recorded from the origins.com domain during a live browsing session. The entries include LPVID=U0N2Zj, ngglobal=969828, ngsession=7fb3b1, OptanonCon=isGpcE, optimizelyEn=oeu175, optimizelySe=175888, PIM-SESSIO=bbNlqc, pixlee_analyt=%7B%2, receive-cook=1, and RT="z=1&", among others. Each record is accompanied by a corresponding domain field such as origins.com or www.origins, and in some cases, the "SameSite" value is labeled "Lax." The displayed data constitutes direct evidence of addressing and signaling metadata showing the active stateful identifiers assigned by the remote server to the client browser, demonstrating that these session variables were transmitted and stored during live communication with the origins.com host.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 23:**



184.   Figures 20 through 23 collectively show a sequential set of network and session artifacts evidencing live communication between the client browser and multiple third-party domains during the user's visit to the origins.com website. Figures 20 and 21 display concurrent HTTPS requests to hosts including trk.clinch.co, tr.snapchat.com, and ui.powerreviews.com, captured in real time through Fiddler, confirming that these exchanges occurred dynamically as the webpage loaded. Figure 22 records DNS activity showing the resolution of pixel.tapad.com to IP address 34.111.113.62, establishing that the client browser initiated addressing and routing operations with Tapad's external infrastructure. Figure 23 shows the cookie state generated during the same session, listing identifiers such as LPVID, ngglobal, OptanonCon, optimizelyEn, and pixlee_analyt assigned under the origins.com and www.origins domains. Taken together, the displayed data provides contemporaneous, packet-level evidence that the user's browser actively connected to and exchanged signaling metadata with multiple external hosts, confirming that identifiers, connection paths, and session variables were transmitted in real time during the same browsing event.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

185. Defendant surreptitiously installed, executed, embedded, or injected the Tapad Tracker onto users' browsers by deploying third-party advertising code that triggers communication with Tapad's tracking infrastructure. When a user visits the Website, their browser automatically executes this code, initiating outbound requests to Tapad's servers and transmitting user metadata including IP address, page URL, and unique identifiers. This transmission occurs silently and without any user action, allowing Tapad to capture data about user interactions on the Website in real time.

186. The Tapad Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

187. The Tapad Tracker is at least a "device" because in order for software to work, it must be run on some kind of computing device. See, e.g., *James v. Walt Disney Co.* 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

188. The Tapad Tracker initiates a connection to its tracking infrastructure during a user session via pixel execution. It captures user metadata such as device identifiers, page path, timestamp, and partner identifiers, all of which constitute routing or signaling information under CIPA.

189. The user does not intentionally initiate any communication with Tapad. The connection is automatically triggered in the background by third-party code executed on the Website. Tapad intercepts and logs communication-related data generated during the user's interaction with the Website. The Tapad Tracker operates as a surveillance mechanism that captures third-party signaling information for data-brokering purposes.

190. Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' express or implied consent to install the Tapad Tracker on Plaintiff's and Class Members' browser or to collect or share data with Tapad.

191. Consequently, the Tapad Tracker violates CIPA regarding unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

/ / /

1    **4.    *The Fullstory Tracker***

2        192.    The FullStory Tracker, delivered via the domain fullstory.com, is a third-

3    party behavioral session-replay script operated by FullStory, Inc. On the Website, this

4    tracker is embedded into the page's source code and executes automatically when a user

5    visits the homepage. During the homepage session, network traffic captured in real time

6    shows outbound requests to FullStory's servers, including connections initiated by fs.js

7    and subsequent data transmissions over secure HTTPS protocols. These transmissions

8    include metadata such as IP address, device type, browser version, viewport size, and

9    unique session identifiers, and occur silently without user interaction, confirming that

10   user activity is recorded and relayed to FullStory's infrastructure during the live

11   browsing session.

12       193.    The FullStory Tracker records detailed interaction events and assigns each

13   browser session a persistent identifier that can be used to reassemble individual user

14   activity. This includes transmission of encoded event streams that correspond to page

15   navigation, cursor movements, scroll depth, and input fields, allowing FullStory's

16   platform to recreate a user's on-page experience. These exchanges link behavioral data

17   generated on the Website with unique identifiers stored within FullStory's session

18   database.

19       194.    The FullStory Tracker enables Defendant to observe, store, and analyze

20   individual session behavior by transmitting granular interaction data to a remote

21   analytics platform under Defendant's control. This functionality allows replay of user

22   sessions, exposure of navigation patterns, and continuous observation of Website use.

23       195.    The FullStory Tracker contributes to Defendant's broader data

24   monetization scheme by converting users' real-time interaction data into actionable

25   behavioral intelligence. By capturing complete session telemetry and transmitting it to

26   FullStory's servers, Defendant gains persistent insight into how individuals interact with

27   its online platform, facilitating data-driven targeting and conversion optimization

28   derived from users' behavioral metadata.

196. Figure 24 below shows multiple HTTPS requests to edge.fullstory.com/…[full URL omitted] for the resource fs.js, each returning a 200 status code. The entries display repeated GET requests initiated within milliseconds of one another, with load times ranging from 32 ms to 92 ms, and referers including https://www.origins.c…[full URL omitted]. The visible fields identify metadata such as the request method, domain, status, timing, and referring page, establishing that the client browser initiated and completed several live connections to edge.fullstory.com during a single session. The displayed data provides verifiable network records evidencing the addressing, routing, and signaling sequence by which the browser retrieved the fs.js script from FullStory's external host in real time.

**Figure 24:**



197. Figure 25 below shows multiple outbound requests labeled "v2?OrgId=o-Z..." displaying structured fields including OrgId o-ZHZ-eu1, UserId 82f230a3-39f4-4ad6-b7d0-d20c2d0c64c3, SessionId aa8f1b3c-684c-41ae-bffc-f8478853ec80, PageId 014b1024-7b43-4725-82b0-86a06327cfb3, Seq 1, ClientTime 1758154216204, CompiledVersion 70083cb7cf5b8f362c7112fb980359be0ec790db, PageStart

1758154213608, PrevBundleTime 0, LastActivity 394, and IsNewSession TRUE. The displayed data constitutes direct evidence of addressing, routing, and signaling metadata exchanged between the browser and the remote endpoint, documenting the transmission identifiers, temporal values, and session-state parameters used to define and maintain the connection with the external host.

**Figure 25:**



198.    Figure 26 below shows a Fiddler capture containing HTTPS requests with 200 status responses to s.amazon-adsystem.com and rs.eu1.fullstory.com, each displaying URL paths beginning with /iu3 and /rec/bundle/ respectively. The visible log includes columns for protocol, host, and URL, confirming active outbound communications with both remote domains. Header values identify Sec-Fetch-Site as cross-site, Sec-Fetch-Mode as cors, Sec-Fetch-Dest as empty, and Referer as https://www.origins.com/…[full URL omitted]. Captured through Fiddler, these records reflect live browser traffic intercepted during the session, showing that the listed connections occurred in real time as the website executed requests. The displayed data

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

provides verifiable network records evidencing the addressing, routing, and signaling metadata defining the connection between the client and the identified external hosts.

**Figure 26:**



199.    Figure 27 below shows DNS query and response entries documenting requests for edge.fullstory.com, edge.eu1.fullstory.com, and rs.eu1.fullstory.com. The visible fields identify the source address 198.19.190.52 and destination 198.19.0.2 under the DNS protocol, with corresponding response entries mapping each queried host to IP addresses 35.201.112.186, 34.120.240.48, and 34.111.143.237 respectively. Because the data was captured through Fiddler, it reflects real-time resolution activity occurring during the live browser session as the client established external host connections. The displayed data provides verifiable network records evidencing addressing and routing metadata that define the communication path between the client and the identified FullStory servers.

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 27:**



200.    Figure 28 below shows a set of visible entries listing paired fields under the columns Name, Value, and Domain. The entries include bm_so with value FDB5DB5 at domain .origins.com, bm_sv with value 9FAA03C at .origins.com, bm_sz with value 34C640B at .origins.com, fs_uid with value #o-ZHZ- at .origins.com, and csrftoken with value 56b61b1 at origins.com. Additional fields such as FE_CART_INFO, fs_lua, LPVID, and ngglobal appear with corresponding values and domains, displaying how identifiers are structured and stored within the browser's environment for the origins.com and origins.com hosts. The displayed data constitutes direct evidence of addressing and session-state metadata showing how the browser recorded and maintained identifiers associated with the site's network transactions.

/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 28:**



201.  Figures 24 through 28 together illustrate how the FullStory Tracker functioned as part of the Website's data-monetization architecture by continuously transmitting user interaction metadata to FullStory's remote servers. Figure 24 shows DNS lookups to edge.fullstory.com, edge.eu1.fullstory.com, and rs.eu1.fullstory.com, confirming direct connections from the user's browser to multiple FullStory-controlled endpoints. Figure 25 records repeated HTTPS requests for the script fs.js from edge.fullstory.com, evidencing that the browser downloaded and executed FullStory's client-side recording code from an external source. Figure 26 captures live, real-time Fiddler traffic showing multiple outbound /rec/bundle/v2… requests to rs.eu1.fullstory.com containing organization, user, session, and page identifiers—demonstrating active transmission of session-level behavioral metadata during browsing. Figure 27 details the structured parameter fields of these transmissions, including OrgId, UserId, SessionId, and PageId, showing that the browser and FullStory's infrastructure maintained a synchronized session context. Figure 28 displays locally stored identifiers such as fs_uid and fs_lua within the origins.com domain,

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

reflecting how the Website retained persistent linkage between browser activity and FullStory session data. Together, these figures show that the Website integrated FullStory to continuously relay behavioral, routing, and signaling metadata in real time to a third-party analytics system, thereby enabling ongoing behavioral profiling and data monetization through external aggregation and analysis of user interactions.

202.   Defendant surreptitiously embedded and executed the FullStory Tracker on users' browsers by deploying third-party session-recording code that triggers continuous communication with FullStory's data-capture infrastructure. When a user visits the Website, their browser automatically executes this script, initiating outbound requests to FullStory's servers at domains such as edge.fullstory.com and rs.eu1.fullstory.com and transmitting user metadata including IP address, page URL, organization ID, user ID, session ID, and page ID. These transmissions occur silently and without user interaction, allowing FullStory to record and replicate user interactions with the Website in real time.

203.   The FullStory Tracker is at least a "process" because it is software that identifies users, records behavioral data, and transmits that data for correlation and analysis.

204.   The FullStory Tracker is at least a "device" because software of this kind must operate on a computing device that sends, receives, and processes communication signals. See, e.g., *James v. Walt Disney Co.* 2023 WL 7392285, at *13 (N.D. Cal. Nov. 8, 2023).

205.   The FullStory Tracker initiates live connections to its remote recording infrastructure during user sessions via script execution. It captures metadata such as device identifiers, session tokens, page paths, timestamps, and other session variables, all of which constitute addressing, routing, or signaling information within the meaning of CIPA.

206.   Users do not intentionally initiate any communication with FullStory. The connection is automatically triggered by embedded third-party code executed on the Website, resulting in FullStory's interception and logging of communication-related

data generated during browsing activity. The FullStory Tracker functions as a persistent surveillance mechanism that captures and relays session-level signaling information for data-analytics and monetization purposes.

207.    Defendant never obtained a court order authorizing the use of a pen register, trap-and-trace device, or process and did not secure Plaintiff's or Class Members' express or implied consent to install or execute the FullStory Tracker or to transmit their communications and metadata to FullStory.

208.    Accordingly, the FullStory Tracker constitutes an unlawful pen register and/or trap-and-trace device under CIPA because it records and transmits communication-routing information without user consent or judicial authorization.

## VI.    CLASS ALLEGATIONS

209.    Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class" or "Class Members") defined as follows:

> All persons within California whose browser was subject to installation, execution, embedding, or injection of the Trackers by the Defendant's Website during the relevant statute of limitations period.

210.    The Class does not include (1) Defendant, its officers, and/or directors; (2) the Judge and/or Magistrate to whom this case is assigned; (3) the Judge or Magistrate's staff and family; and (4) Plaintiff's counsel and Defendant's counsel.

211.    Plaintiff reserves the right to amend the above class definition and add additional classes and subclasses as appropriate based on investigation, discovery, and the specific theories of liability.

212.    **NUMEROSITY:**  Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members can be ascertained by the records maintained by Defendant.

213.    **COMMONALITY:**  Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class

members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

- Whether Defendant installed, executed, embedded, or injected the Trackers on the Website;
- Whether the Trackers are each a pen register and/or trap and trace device as defined by law;
- Whether the FullStory Tracker unlawfully captured the content of communications without consent or a court order;
- Whether Plaintiff and Class Members are subject to same tracking policies and practices;
- Whether Defendant violated CIPA;
- Whether Plaintiff and Class Members are entitled to statutory damages;
- Whether Class Members are entitled to injunctive relief; and
- Whether Class Members are entitled to disgorgement of data unlawfully obtained.

214.  **TYPICALITY:**  As a person who visited Defendant's Website and whose outgoing electronic information was surreptitiously collected by the Trackers, Plaintiff is asserting claims that are typical of the Class Members. Plaintiff's experience with the Trackers is typical to Class Members.

215.  **ADEQUACY:**  Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class or whose inclusion would otherwise be improper are excluded.

216.  **SUPERIORITY:** A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in

1  which individual litigation of numerous cases would proceed. Individualized litigation
2  also presents a potential for inconsistent or contradictory judgments.

### VII.    FIRST CAUSE OF ACTION

### Violations of Cal. Penal Code § 638.51

### *By Plaintiff and the Class Members Against All Defendants*

6  217.    Plaintiff reasserts and incorporates by reference the allegations set forth in
7  each preceding paragraph as though fully set forth herein.

8  218.    Plaintiff brings this claim individually and on behalf of the members of the
9  proposed Class against Defendant.

10  219.    Defendant uses a pen register device or process and/or a trap and trace
11  device or process on its Website by deploying the Trackers because the Trackers are
12  designed to capture the IP address, User Information, and other information such as the
13  phone number, email, routing, addressing and/or other signaling information of website
14  visitors.

15  220.    Defendant did not obtain consent from Plaintiff or any of the Class
16  Members before using pen registers or trap and trace devices to locate or identify users
17  of its Website and has thus violated CIPA. CIPA imposes civil liability and statutory
18  penalties for violations of § 638.51. Cal. Penal Code § 637.2; *Moody v. C2 Educational*
19  *Systems, Inc.*, No. 2:24-cv-04249-RGK-SK, 2024 U.S. Dist. LEXIS 132614 (C.D. Cal.
20  July 25, 2024).

### VIII.    SECOND CAUSE OF ACTION

### Violation of Cal. Penal Code § 631

### *By Plaintiff and the Class Members Against All Defendants*

24  221.    Plaintiff reasserts and incorporates by reference the allegations set forth in
25  each preceding paragraph as though fully set forth herein.

26  222.    Plaintiff brings this claim individually and on behalf of the members of the
27  proposed Class against Defendant.

28  / / /

223.    California Penal Code § 631(a) prohibits any person from (1) willfully intercepting or attempting to intercept the contents of any communication passing over any wire, line, or cable; (2) reading, attempting to read, or learning the contents or meaning of any such communication while in transit or being sent; or (3) aiding or conspiring with another to do so, without the consent of all parties to the communication.

224.    Defendant violated § 631 by intentionally embedding and executing third-party session-replay code provided by FullStory, Inc. ("FullStory") on the Website. When a user visits the Website, the FullStory script automatically initiates outbound connections to remote FullStory servers, including but not limited to edge.fullstory.com and rs.eu1.fullstory.com. These transmissions include user communications such as text entered into fields, clicks, mouse movements, scrolls, and the content displayed on the user's screen.

225.    The FullStory software contemporaneously intercepts these communications as they occur between the user's browser and the Website, transmitting them to FullStory's servers where they can be reassembled and replayed. These transmissions include not only metadata as set forth in the First Cause of Action herein, but the *contents* of communications within the meaning of § 631(a), because they reveal the substance of what users view, type, and transmit while interacting with the Website.

226.    Defendant intentionally enabled, facilitated, and aided FullStory's unlawful interception by choosing to deploy its recording code, knowing that it caused user communications to be duplicated and transmitted to a third party for analysis and replay. Defendant did not obtain the consent of Plaintiff or any Class Member to intercept or disclose the contents of their communications to FullStory.

227.    Neither Defendant nor FullStory obtained a court order authorizing the installation or use of any wiretapping device.

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

228.  By embedding and executing the FullStory script to intercept, record, and transmit the contents of the communications of Plaintiff and the Class Members without consent, Defendant violated California Penal Code § 631(a).

229.  As a direct and proximate result of these violations, Plaintiff and Class Members suffered injury and invasion of legally protected privacy interests. Pursuant to § 637.2, Plaintiff and Class Members are entitled to statutory damages of $5,000 per violation, injunctive relief, and any other relief the Court deems just and proper.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following:

1.  An order certifying the Class, naming Plaintiff as Class representative, and naming Plaintiff's attorneys as Class counsel;

2.  An order declaring that Defendant's conduct violates CIPA;

3.  An order of judgment in favor of Plaintiff and the Class against Defendant on the cause of action asserted herein;

4.  An order enjoining Defendant's conduct as alleged herein;

5.  Disgorgement of profits resulting from unjust enrichment;

6.  Statutory damages pursuant to CIPA;

7.  Injunctive Relief;

8.  Prejudgment interest;

9.  Reasonable attorney's fees and costs; and

10. All other relief that would be just and proper as a matter of law or equity.

/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1

## DEMAND FOR JURY TRIAL

2        Plaintiff hereby demands a trial by jury on all causes of action and issues so

3    triable.

4                                       Respectfully submitted,

5    Dated:   October 20, 2025    **NATHAN & ASSOCIATES, APC**

6

                           By: *_/s/ Reuben D. Nathan_*

7                               Reuben D. Nathan

8                               2901 W. Coast Hwy., Suite 200

9                               Newport Beach, CA 92663
                           Office: (949) 270-2798

10                               Email: rnathan@nathanlawpractice.com

11                               **LAW OFFICES OF ROSS CORNELL, APC**

12                               Ross Cornell, Esq. (SBN 210413)

13                               P.O. Box 1989 #305
                           Big Bear Lake, CA 92315

14                               Office: (562) 612-1708

15                               Email: rc@rosscornelllaw.com

16                               *Attorneys for Plaintiff and the Putative Class*

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED